NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-135                                          Appeals Court
14-P-136


ROSE PETRIELLO  vs.  ALBERT INDRESANO
(and a companion case[1]).


No. 14-P-135.

Norfolk.      October 9, 2014. - June 3, 2015.

Present:  Berry, Hanlon, & Carhart, JJ.


Harassment Prevention.  Civil Harassment.  Practice, Civil, Standing, Findings by judge.  Agency.



Complaints for protection from harassment filed in the Dedham Division of the District Court Department on July 29, 2013.

The cases were heard by Robert P. Ziemian, J.


Sarah W. Peterson for the defendants.
Frank Hadley Wright, III, for the plaintiff.


HANLON, J.  The defendants, Albert Indresano, Jr. (Albert), and Joseph Indresano (Joseph), seek review of G. L. c. 258E

---

[1] Rose Petriello vs. Joseph Indresano.

harassment prevention orders (orders) issued against them.[2,3]
They argue that Veronica Higgins-Sullivan, acting under a power
of attorney (POA) executed by the plaintiff, Rose Petriello,
lacked standing to apply for these orders on Petriello's behalf.
The defendants also claim that the abusive conduct that Higgins-
Sullivan alleged did not meet the requirements for issuing the
orders.  Although we are satisfied that Higgins-Sullivan had
standing to apply for the orders, due to the very sparse record
before us, we are constrained to conclude that there was
insufficient evidence to support issuance of the orders under
G. L. c. 258E.

Background.  The judge heard the following evidence,
largely based on the testimony of Higgins-Sullivan, which the
judge apparently credited.  Petriello lived with Albert
Indresano Sr. as a domestic partner, for approximately forty-
five years, beginning in 1956; Albert, Sr., had four children,
Albert, Joseph, Rosemary Indresano, and Joanne McKeage.  After
Albert Sr.'s death, Petriello moved to 51 Smith Street in
Wellesley, a property belonging to a trust that Albert Sr. had
established for her benefit.  On December 6, 2005, Petriello

---

[2] We allowed a motion to consolidate Albert's appeal with
that of his brother, Joseph.

[3] We use first names for members of the Indresano family.

executed a health care proxy, appointing Albert as her health care agent; she named Joseph as the alternate.

In April, 2013, Petriello, then approximately eighty-eight years old, had a knee operation at Newton-Wellesley Hospital. Afterwards, she went to Elizabeth Seton Residence, a rehabilitation facility in Wellesley Hills. On May 22, 2013, Petriello executed a new health care proxy, appointing Higgins-Sullivan as her health care agent.[4] Petriello left Elizabeth Seton Residence on June 6, 2013, and moved directly to Waterstone, an assisted living facility in Wellesley Hills (Waterstone). Higgins-Sullivan testified that Petriello wanted to move from her 51 Smith Street home because "the trust was broken" -- her bills and expenses were not being paid in accordance with Albert Sr.'s will, and neither Albert nor Joseph would allow Petriello to have access to her own checkbook.

Higgins-Sullivan had agreed to replace Albert as health care agent after Petriello telephoned her in April, 2013. During the telephone call, Petriello was "very upset" because Albert, Joseph, and Rosemary "claimed that [Petriello] had an abortion in 1956." Higgins-Sullivan testified that Petriello, an eighty-eight year old practicing Catholic, denied the accusation and "it upset [her] to no end." Apparently, one of

---

[4] Albert Sr. was Higgins-Sullivan's biological uncle. Higgins-Sullivan had known Petriello since 1956 and considered her to be her aunt.

the Indresanos then took the telephone from Petriello; however, Higgins-Sullivan stayed on the line as "[she] was afraid for [Petriello]," because the three Indresanos "were yelling, screaming, carrying on."  "After they hung up [Higgins-Sullivan] immediately called the Wellesley police."[5]

Higgins-Sullivan also testified that, although Petriello had been living alone at 51 Smith Street, Albert and Joseph had gone in and out of the house as they pleased, allowing her no privacy.[6]  Petriello telephoned Higgins-Sullivan daily complaining about the Indresanos; because Petriello "was so very upset she was calling [Higgins-Sullivan] more.  It was almost like it was . . . like a blow by blow description of what was going on with [Petriello]."[7]

---

[5] In addition, Higgins-Sullivan testified that, one week prior to that telephone conversation, she had been informed that someone had telephoned the protective services program of the Springwell agency, discussed infra, reporting allegations of elder abuse of Petriello.  The record contains no information about who filed the complaint, who was alleged to have committed the abuse, or the nature of the alleged abuse.

[6] According to Higgins-Sullivan, when Albert Sr. was alive, neither of his sons was allowed on his property, and at one point, "he even had a restraining order out on them."

[7] According to Petriello, Albert and Joseph "were upstairs on the extension listening" to their daily telephone conversations, or Joseph "would be outside an open window by the kitchen listening to the conversation."  Petriello had no privacy; "[i]t was just a constant, constant barrage of things that happened to this woman."

Before Petriello moved to Waterstone, Albert and Joseph went to Waterstone and instructed the staff not to have contact with her because Albert and Joseph did not want her to move from 51 Smith Street. Higgins-Sullivan believed that Albert and Joseph were asked by the Waterstone staff to leave the premises. The Waterstone staff scheduled a car to pick up Petriello when she was discharged from Elizabeth Seton Residence, but Albert and Joseph canceled it. In addition, Joanne canceled a moving van that had been scheduled to move Petriello's belongings from 51 Smith Street to Waterstone; also, the locks at 51 Smith Street were changed, preventing Petriello from gaining access to her furniture and other belongings.

Petriello moved to Waterstone on June 6, 2013. According to Higgins-Sullivan, Petriello initially enjoyed her life there, as "she's a very sociable person" and was interacting with other residents. On June 17, 2013, Petriello executed the POA, designating Higgins-Sullivan as her attorney-in-fact, effective that date. Sometime after Petriello moved to Waterstone, Albert and Joseph began visiting her there. Petriello told Higgins-Sullivan that she had moved from 51 Smith Street to get away from the Indresanos, but "they were camping out at Waterstone. . . . [I]t was the same as if she was still at 51

Smith Street. . . . [I]t was just a constant . . . belittling, abuse."[8]

In approximately July, 2013, Petriello "got very depressed." According to Higgins-Sullivan, "She wouldn't eat. She wouldn't get dressed. She didn't, wouldn't bathe and a psychiatric nurse was called in. . . . She was in a bad way." The ensuing psychiatric evaluation revealed that "there had to be a complete break from the Indresanos." Petriello was sent to the "Newton-Wellesley Hospital in the emergency room," until a room in a locked ward became available for her at Mount Auburn Hospital. In a letter dated July 24, 2013, Dr. James A. Evans, Petriello's treating psychiatrist at Mount Auburn Hospital, determined that Petriello no longer had the capacity to make her own decisions due to dementia, and invoked the existing health care proxy. Around the same time, Dr. Evans suggested to Higgins-Sullivan that she obtain a harassment order against the Indresanos on Petriello's behalf. Higgins-Sullivan did so; on July 29, 2013, a judge of the Dedham Division of the District

---

[8] Specifically, according to Higgins-Sullivan, Albert and Joseph said to Petriello, "'[Y]ou shouldn't be moving down here to Waterstone. We're your family. You don't belong at Waterstone.'. . . [O]ne of them even said, '[T]hat place is for Jews and not for Italians. You belong with Italians and Irish.'" Higgins-Sullivan claimed it was all "foolish nonsense" to get Petriello to move back to 51 Smith Street; Petriello "did not want to leave Waterstone. She was in her element. She enjoys people."

Court Department issued ex parte harassment prevention orders, one against Albert and the other against Joseph, and scheduled a hearing after notice for August 7, 2013.[9,10]

Petriello returned to Waterstone after she was discharged from Mount Auburn Hospital, and after the initial orders had been issued. Petriello's health care providers at Mount Auburn Hospital told Higgins-Sullivan not to discuss with Petriello anything pertaining to the Indresanos because it was too upsetting for her.[11]

Allison Schnaer was a "protective service supervisor" at Springwell, "an agency that receives [and investigates] reports of abuse and neglect for people who are over the age of sixty." Schnaer testified that in April, 2013, Springwell received an elder abuse report with Petriello as the alleged victim. The report was "screened in" by a supervisor because the allegations

---

[9] The July 29, 2013, orders ordered Albert and Joseph not to abuse Petriello, not to contact her, and to stay at least one hundred yards away from her and from the entire building in which she resided at 23 Washington Street, Wellesley.

[10] On the same day, harassment prevention orders also were issued against Rosemary, Donna Indresano (Joseph's wife), and Joanne ; those orders are not a part of this appeal.

[11] At the end of the first hearing day, three letters from Waterstone and one letter from a nurse, all describing the conduct of the defendants, were submitted and marked for identification. The record does not indicate whether the letters were admitted in evidence and they are not in the record before us.

fit Springwell's "definition[] of abuse."[12]  Schnaer first met
Petriello at the discharge planning meeting at Mount Auburn
Hospital; her second meeting with Petriello was at Waterstone,
to check on her after she was discharged from Mount Auburn
Hospital.  In conversation with Schnaer, Petriello brought up
the pending harassment order hearing; she told Schnaer that "she
was in agreement with the restraining order."  According to
Higgins-Sullivan, Petriello told a Springwell representative
that she no longer wanted to see or to talk to the Indresanos.
During its investigation, Springwell "did substantiate the
allegations" of elder abuse; an ongoing service plan was created
for Petriello in an attempt to "help her stay safe in her
community and at Waterstone and reduce the emotional abuse that
was going on."  Schnaer testified that the risks to Petriello
changed due to her hospitalization and move to assisted living;
however, at the time of the hearing, Petriello's case with
Springwell was still "ongoing."

At the close of the evidence, the judge denied the
defendants' oral motions for directed verdicts.  The judge
stated that, in applying the law to the case, the standard would
be based on "an eighty eight year old woman," and that he had

---

[12] As part of its screening process, Springwell reviews each
report for six indicators of abuse:  physical abuse, emotional
abuse, sexual abuse, financial exploitation, caregiver neglect,
and self-neglect.

"no problem finding physical harm to her when she went to the emergency room."[13]  The judge extended the orders against Albert and Joseph for one year, that is, until August 8, 2014.[14]

Discussion.  Standing.  It appears, and the defendants do not argue otherwise, that the POA was valid and that it was in full force and effect at the time that Higgins-Sullivan sought the harassment prevention orders.[15]  Nonetheless, the defendants argue that Higgins-Sullivan, despite the POA, did not have standing to seek the orders on Petriello's behalf.  In their view, designation as a guardian ad litem would have sufficed, but not a POA.

The effect of a written POA is a legal issue.  McQuade v. Springfield Safe Deposit & Trust Co., 333 Mass. 229, 233 (1955).  "[The court] must put [itself] in the place of the parties to the instrument and give its words their plain and ordinary meaning in the light of the circumstances and in view of the subject matter. . . .  The rule of construction that a

_____

[13] The transcript provided to us does not include the final arguments.

[14] It does not appear that the judge addressed the defendants' requests for written findings pursuant to Mass.R.Civ.P. 52, as amended, 423 Mass. 1408 (1996).

[15] At the hearing on August 7, 2013, the defendants conceded that they "didn't see any problems with witnessing" as to the document designating Higgins-Sullivan as the health care agent. Counsel off-handedly raised "a question of undue influence," but did not pursue it.  There is, however, no reference to the POA or to concerns about the validity of that instrument.

power of attorney must be strictly interpreted does not go to the extent of destroying the purpose of the power." Ibid. See Grabowski v. Bank of Boston, 997 F. Supp. 111, 125 (D. Mass. 1997) ("In most respects, a power of attorney is interpreted in the same manner as any other contract. . . . A contract must be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose. See J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 [1986]. In interpreting a contract, the court 'must give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible.' Shea v. Bay State Gas Co., 383 Mass. 218, [224-225 (1981)]").

Here, the POA explicitly granted to Higgins-Sullivan the authority to "exercise or perform any act, power, duty, right or obligation whatsoever that [Petriello then had], or may hereafter acquire, relating to any person, matter, transaction, personal or real property, now owned or hereafter acquired . . . , to the same extent that [Petriello herself] might do if personally present." In addition, paragraph 29 of the POA specified that "[a]ny party dealing with any person named as attorney-in-fact hereunder may rely absolutely upon the authority granted herein and need not look to the application of any proceeds nor the authority of [Petriello's] said attorney-in-fact as to any action taken hereunder." In all of the

circumstances of this case, including the timing of the execution of the POA, in the midst of ongoing conflict with members of the Indresano family, and soon after Petriello changed her health care agent designation from Albert (and Joseph as alternate) to Higgins-Sullivan, it is reasonable to conclude that Petriello intended for Higgins-Sullivan to act on her behalf at least in all matters relating to the Indresanos.[16]

Further, paragraph 25 of the POA required that Higgins-Sullivan consult with Petriello on "matters pertaining to the exercise of powers under this instrument." While Higgins-Sullivan herself did not testify in detail about any conversation with Petriello on that subject, the fact that Petriello brought up in conversation with Schnaer the subject of the pending orders and her agreement with them, is a clear indication that the required consultation took place. Cf. Gagnon v. Coombs, 39 Mass. App. Ct. 144, 156 (1995).

As a result, when Higgins-Sullivan sought and was granted the orders, she did so with the powers validly granted to her under the POA, despite the fact that Petriello had been declared

---

[16] We also have in mind the unrebutted testimony of Higgins-Sullivan, credited by the judge, that Petriello's treating psychiatrist, who invoked the health care proxy, also advised Higgins-Sullivan to seek a harassment prevention order on Petriello's behalf against the Indresanos, as well as the counsel of another medical professional caring for Petriello that the Indresanos should not be mentioned to Petriello, for fear of upsetting her.

incompetent. See G. L. c. 190B, §§ 5-501, 5-502.[17] As attorney-in-fact, Higgins-Sullivan's act of seeking the orders was, in effect, equivalent to Petriello seeking the orders were she competent to do so. See id. at § 5-502. We are satisfied that Higgins-Sullivan, as the attorney in fact named in the POA, had proper standing to seek orders on behalf of Petriello.

Sufficiency of the evidence. In reviewing a civil harassment prevention order, we consider whether the judge could find, by a preponderance of the evidence, together with all permissible inferences, that the defendant had committed "[three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that [did] in fact cause fear, intimidation, abuse or damage to property." G. L. c. 258E, § 1, inserted by St. 2010, c. 23. See Seney v. Morhy, 467 Mass. 58, 60 (2014). See also O'Brien v. Borowski, 461 Mass. 415, 420 (2012) ("[T]he acts of harassment must be wilful and '[m]alicious,' the latter defined as 'characterized by cruelty, hostility or revenge,' and they must be committed with

---

[17] "All acts done by an attorney in fact pursuant to a durable power of attorney during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal and his successors in interest as if the principal were competent and not disabled. Unless the instrument states a time of termination, the power is exercisable notwithstanding the lapse of time since the execution of the instrument." G. L. c. 190B, § 5-502, inserted by St. 2008, c. 521, § 9.

'the intent to cause fear, intimidation, abuse or damage to property.' . . . Second, the multiple acts of civil harassment must 'in fact cause fear, intimidation, abuse or damage to property'"), quoting from G. L. c. 258E, § 1.

In the context of a civil order, the test is a subjective one; if all of the other elements are present, it is sufficient to show that the harassment actually caused fear, intimidation, or abuse to the plaintiff, even if a reasonable person in the plaintiff's situation would not have been so affected.[18] O'Brien, supra. Contrast G. L. c. 265, § 43A, as appearing in St. 2010, c. 92, § 10 ("Whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress, shall be guilty of the crime of criminal harassment and shall be punished" [emphasis supplied]). In addition, while the plaintiff must show that the defendant committed three specific acts, and that, for each act, "the defendant intended to cause fear, intimidation, abuse, or damage to property," it is "the entire course of harassment, rather than each individual act, that must cause fear or intimidation." O'Brien, supra at 426 n.8.

---

[18] It is also sufficient if the plaintiff shows damage to her property.

The record before us is very thin, and it is replete with generalities and conclusions. There certainly is evidence from which the judge properly concluded that Petriello was physically harmed by the conduct of the defendants and other members of their family. In addition, there was at least one act, as the defendants concede, that fairly could have been deemed abusive -- when someone took the telephone away from Petriello and there was yelling and screaming in the background to such an extent that Higgins-Sullivan stayed on the line until the telephone call was ended; she then telephoned the Wellesley police. However, on this record, we do not know who was present when that occurred nor who participated, either by taking the telephone away or by acquiescing in the behavior and being available to assist in the harassment and intimidation.

In addition, the demands of c. 258E are quite specific and they differ from those of G. L. c. 209A in more ways than simply who is entitled under the statute to seek the court's protection. For example, in this case, if the court had had jurisdiction under c. 209A because, for example, the defendants had once lived with Petriello, making them former household members, it is possible that the defendants' behavior, if proven by credible evidence, might reasonably have justified issuing an abuse prevention order under c. 209A. That is, the judge might have been persuaded that the defendants' behavior constituted

abuse because it caused physical harm to Petriello.  G. L. c. 209A, § 1.[19]

To support a harassment prevention order under c. 258E, however, there must be three specific acts of harassment. See Seney v. Morhy, 467 Mass. at 63; Smith v. Mastalerz, 467 Mass. 1001 (2014).  If the case involves speech, it must fall "within [a] constitutionally unprotected category of speech."  Commonwealth v. Johnson, 470 Mass. 300, 311 (2014). In O'Brien, the court gave as examples of unprotected speech both "fighting words" ("words that are likely to provoke a fight:  face-to-face personal insults that are so personally abusive that they are plainly likely to provoke a violent reaction and cause a breach of the peace"), and "true threats" ("'those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals,' . . . [W]ords that are intended to place the target of the threat in fear, whether the threat is veiled or explicit' [citations omitted]).  461 Mass. at 423-424.

In Johnson, the court held the evidence sufficient to support a criminal conviction of harassment where the defendants

---

[19] There is no showing on this record that the defendants in fact were former household members of Petriello or that she otherwise qualified for relief under G. L. c. 209A.  Cf. Sorgman v. Sorgman, 49 Mass. App. Ct. 416, 417 (2000); Aguilar v. Hernandez-Mendez, 66 Mass. App. Ct. 367, 370 (2006).

had created false Internet postings, "luring numerous strangers and prompting incessant late-night telephone calls to [the victims'] home." 470 Mass. at 309. The Johnson defendants also had falsely accused one of the victims of committing a serious crime and threatened to misuse the victims' personal identifying information. Ibid. "Where the sole purpose of the defendants' speech was to further their endeavor to intentionally harass the [victims], such speech is not protected by the First Amendment. 'The [F]irst [A]mendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose.' United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982)." Johnson, supra.

In this case, on this record, we can see only the one act of harassment conceded, and, even as to that, as noted supra, we cannot say who was present, who took the telephone away from Petriello, nor who assisted or was merely present. Many of the other allegations -- things alleged to have been said by the defendants, including accusing Petriello of having undergone an abortion, however distressing to her, cannot fairly be said to constitute harassment, as the statute has been interpreted, at least on the record before us, which tells us nothing about who made the accusation or in what circumstances. The words themselves, without a context, are neither a threat nor fighting words. Nor can the accusation that Petriello had an abortion,

by itself, reasonably be considered "[s]peech integral to criminal conduct." Id. at 311. As part of a larger plan wilfully and maliciously to cause fear, intimidation, or abuse, such an accusation, particularly if false, might be considered an act of harassment, if the record showed that a particular defendant had said it to Petriello. However, even if there were record support, that accusation would be only a second act of harassment.

As to the other testimony, this record does not reveal what happened at Waterstone when the defendants were asked to leave; who canceled the car that was to pick Petriello up at Elizabeth Seton Residence and take her to Waterstone; what conduct led to Dr. Evans's recommendation that Higgins-Sullivan seek a harassment order; or what allegation was made to, and substantiated by, Springwell. Nor can we say, on this record, whether Petriello suffered actual fear for her physical safety or her property, or, instead, embarrassment at the allegations and distress about the invasion of her privacy and unwanted presence of Albert and Joseph. We do not dismiss lightly the possibility that Petriello's distress caused her physical harm and we express no opinion whether on these facts a judge might find that the defendants intended to cause Petriello harm or whether they did so wilfully or maliciously. Nevertheless, because the record does not permit a finding of three specific

acts of harassment by these defendants, we are constrained to order the harassment prevention orders to be vacated.  We remand this case to the District court for entry of orders consistent with this opinion.

So ordered.