NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11974

COMMONWEALTH  vs.  HARVEY J. BIGELOW.


Bristol.     January 8, 2016. - September 27, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.[1]


Criminal Harassment.  Constitutional Law, Freedom of speech and
    press.  Practice, Criminal, Argument by prosecutor.



Complaint received and sworn to in the Taunton Division of
the District Court Department on November 18, 2011.

The case was tried before Gregory L. Phillips, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Diana Cowhey McDermott for the defendant.
David B. Mark, Assistant District Attorney, for the
Commonwealth.


BOTSFORD, J.  In 2013, the defendant Harvey Bigelow was

convicted of two counts of criminal harassment under G. L.

---

[1] Justice Duffly participated in the deliberation on this
case and authored her separate opinion prior to her retirement.
Justices Spina and Cordy participated in the deliberation on
this case prior to their retirements.

c. 265, § 43A (§ 43A). The charges were based on five letters the defendant allegedly wrote and sent to Michael Costello and Susan Costello[2] in 2011, following a local election in the town of Rehoboth (town) in which Michael had been elected as a town selectman. We consider here the defendant's appeal from these convictions; his principal claim is that both convictions must be reversed because the letters consisted of political speech -- expressions of dissatisfaction with Michael's performance as a selectman -- that is constitutionally protected. We reverse the defendant's conviction of criminal harassment of Michael and order that count of the complaint dismissed; we vacate his conviction of criminal harassment of Susan, set aside the verdict, and remand for a new trial on the count of the complaint relating to Susan.

Background. In April, 2011, Michael was elected as a selectman of the town. Between May 9 and July 23, 2011, at approximately two-week intervals, the Costellos received five anonymous, type-written letters that were mailed to their home. The letters were addressed to both Costellos or to Susan, and all were authored by the defendant.[3]

---

[2] Because Michael Costello and Susan Costello share a last name, we refer to each by his or her first name to avoid confusion.

[3] The defendant does not challenge on appeal the sufficiency of the evidence that he was the author of the five letters, most

The first letter, received around May 9, was sent to the Costellos in an envelope addressed to "Mr. and Mrs. Costello," but the salutation in the letter itself mentioned only Michael. Although the letter included a variety of personal insults directed to and at Michael, in significant part it consisted of statements criticizing Michael's performance as a selectman, including, as its opening salvo, the following: "Michael Costello -- The biggest fucking loser I have ever met. You should be utterly ashamed of yourself for even suggesting that anyone take you seriously as 'chairman of the board of selectm[e]n.' It won't be long before you crash and burn big time."[4]  The letter ended as follows:

> "This is how it will go down real soon -- you will be arrested at town meeting, relieved of all your town positions, and ultimately be sent to prison as a [two] time loser convicted felon. I'm guessing maybe [ten] years this time if nothing else comes out. Sound good you fucking asshole. Can't wait to see you handle Monday night. We will all be staring at you!!!!!!!!!!  This letter will be

of which purported to be from "a concerned citizen," and therefore we treat as established his identity as the author.

[4] This introduction was followed by other, thematically similar comments that appeared later in the letter, including:

> "You are not even close to being capable in any way to be a selectman, never mind a floor sweeper. Totally not capable to do the job. . . .  The tide is turning against you in town and people are talking about you -- negatively. . . . I hear that a group of people will be at all future town meeting[s] to stare you down, talk ou[t] of turn, criticize -- just like you used to do. Look for the big shit eatin[g] grins."

all over town by then as well as at selectmens'[sic] meeting. You really fucked up this time Mikey boy."[5]

The envelope of the second letter, sent on May 26, was addressed to Susan, but again the text of the letter itself appeared to be directed to Michael.  The letter referred to Michael's "criminal mess" and stated that Michael "is indeed being investigated by not only the inspector general, but also by the Attorney General and the FBI"; that Michael "is guilty of fraud . . . [and] screwed a nice old senior citizen . . . out of his house by scamming the lottery"; and that he "was indeed convicted of stealing from Horner Millwork and sentenced to three years in prison plus probation and restitution . . . we will have [the public record of his conviction] at Tuesday's meeting."  The letter exhorted Michael to "resign immediately or else.  Or be put on administrative leave -- pending investigation," and later repeated, "resign immediately I suggest."  The letter added, "this is such a good letter I think I will send it around and post it at Vino's."[6]

Attached to either the second or the third letter was a separate, handwritten note that stated:

---

[5] The record contains no evidence that the letter was -- or indeed that any of the letters were -- read at any meeting of the board of selectmen.

[6] There was no evidence that the letter was "posted" or made public in any venue.

"Mikey + Susan --

"Please forward your new address AFTER YOU MOVE.  I know where you can buy a tent or maybe you have $245,000 to buy that house in our development.

"The Horner boys [and] the newsmen will be there Tues[day].  I wouldn't show up if I were you.

"A Concerned Citizen"

The third and fourth letters, respectively sent June 15 and sometime near or at the end of that month, were each sent in an envelope addressed to Susan and the salutation of each letter was also directed to her.  The third letter began, "I am sure you are not surprised to receive another letter regarding the disgusting cheat you are married to. . . .  [W]hat were you thinking getting tied up with such a scum bag."  Following another three paragraphs of derogatory comments about Michael and rhetorical questions asking how Susan could defend him, the letter ended with a suggestion that Susan would need to move out of her home:  "Have you selected a new place to live?  Maybe now would be a good time to preplan your future. . . .  If I were you, I'd spend less time defending this worthless human being and more time worrying about yourself."

The fourth letter enclosed a copy of a page from a newspaper containing a critical letter to the editor written by a retired attorney about Michael's "abuses" and the fact that Michael was being investigated by the Attorney General and other

State authorities; across the copy was a handwritten comment stating, "Suzie -- Preview of Coming Attractions" (emphasis in original).  The fourth letter itself stated, "[t]he authorities will continue to hound [Michael] until you and he can't stand it anymore.  Maybe you will have to live like Whitey Bulger frequenting plastic surgeons to have any hope of a peaceful lifestyle.  The only difference is Whitey has unlimited funds and you don't."

The envelope containing the fifth letter was addressed to "Susan 'The Maid' Costello" and was sent July 23.  The salutation of the letter itself was addressed to "Lorraine," but handwritten across the top was a message stating, "Hey Sue – why don't you come to the meeting on Mon."  The letter asked if Lorraine was "screwing" Michael, and stated that "[w]ord about town is that he is screwing the assistant town clerk or treasurer, or maybe both.  There are pictures being circulated that prove it."  The letter then asked if Lorraine knew that Michael had undertaken a series of criminal acts, including stealing, and forging checks, and further that he "forged title to his wife's car[,] set fire to his wife[']s house with her in it[,] [and] screwed the cleaning lady then married her."[7]

After receiving and opening the first letter, Michael brought it to the police.  Thereafter, the police began an

---

[7] We infer the reference was to Susan.

investigation and Michael delivered all five letters to the police department, receiving back copies of the letters from the police a few days later.  Both Costellos read all five letters, either at the time they arrived by mail at their home or at a later point when the police provided the copies.  Michael testified at trial that he "felt like [his] character was run through mud and . . . it was [not] fair" and that he suffered a "bad" emotional reaction, principally because of the effect on his wife:  he "felt bad that [his] wife had to go through a situation like this because [he] was [aspiring] to be a selectman."  Susan testified that she "was hysterical," and that she "couldn't stop crying, couldn't sleep," was "afraid to live in" her own home, and "afraid to be alone."  She further testified the letters were "affecting [her] whole life" and she was "ready to move" by the time she received the fifth letter because she was "scared out of [her] mind" to be living in the town and specifically at the their house.

On November 18, 2011, a two-count complaint issued out of the District Court charging the defendant with criminal harassment in violation of § 43A.  The first count named Michael and the second count named Susan as the person at whom the alleged acts of harassment were directed.  The defendant filed a motion to dismiss that was denied by a District Court judge. Trial took place in August, 2013, and the jury found the

defendant guilty on both counts.[8]  He was sentenced to one year of supervised probation, and as conditions of probation, was ordered to stay away from Susan and to write a letter of apology to the Costellos, with the letter to be published in three local newspapers.  The defendant filed a timely appeal and we transferred this case on our own motion.

Discussion.  1.  Protected speech and § 43A.  The criminal harassment statute punishes "whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress."[9]  G. L. c. 265, § 43A (a).  The statute specifies that conduct or acts qualifying as criminal harassment under its terms "shall include, but not be limited to, conduct or acts conducted by mail."  Id.

"[Section] 43A is a statute directed at a course of conduct, rather than speech," Commonwealth v. Johnson, 470 Mass. 300, 308 (2014), but unquestionably, the statute reaches speech,

_____

[8] The defendant moved for a required finding of not guilty at the close of the Commonwealth's case; the motion was denied.

[9] This court has specified that to prove a "pattern of conduct or series of acts," under G. L. c. 265, § 43A (§ 43A), the Commonwealth must "prove three or more incidents of harassment."  Commonwealth v. Welch, 444 Mass. 80, 89 (2005), overruled on another ground by O'Brien v. Borowski, 461 Mass. 415 (2012).

treating speech as a form of conduct.  See Commonwealth v.
Welch, 444 Mass. 80, 87-89 (2005).  On various occasions, this
court has grappled with the application of § 43A and its
relationship to the First Amendment to the United States
Constitution where speech is involved.  See Welch, supra at 93-
100.  See also Johnson, supra at 307-312.  Cf. O'Brien v.
Borowski, 461 Mass. 415, 420-421, 425 & n.7 (2012) (discussing
§ 43A in case involving civil harassment statute, G. L.
c. 258E).  In Welch, supra, where the defendant's criminal
harassment convictions were based solely on incidents of pure
speech, id. at 92 & n.13, the court reviewed § 43A and its
legislative history, and concluded that in "carefully crafting"
§ 43A, the Legislature "intended the statute be applied solely
to constitutionally unprotected speech."  Welch, supra at 99.
See id. at 98-99.[10]  Accord, O'Brien, supra at 420, 425.[11]  We

---

[10] In the Welch case, the court reversed the defendant's
convictions of criminal harassment and ordered the complaints
dismissed because there were an insufficient number of incidents
of alleged harassment to satisfy the statutory requirements of
"pattern" or "series."  Welch, 444 Mass. at 93.

[11] In Welch, 444 Mass. at 99, the court considered only
"fighting words" as a category of unprotected speech that § 43A
could constitutionally reach, but in O'Brien, 461 Mass. at 425
n.7, and Commonwealth v. Johnson, 470 Mass. 300, 311 (2014), the
court subsequently clarified that true threats, along with other
"well-defined and limited categories," id., of constitutionally
unprotected speech, fall within the scope of § 43A.  Another
relevant category of speech that the United States Supreme Court
has recognized as falling into the unprotected category, as
Johnson, supra, points out, is "[s]peech integral to criminal

added in the <u>Welch</u> case that "[s]hould the Commonwealth attempt to prosecute an individual for speech that is constitutionally protected, we would have no hesitation in reading into the statute such a narrowing construction to ensure its application only to speech that is accorded no constitutional protection." <u>Welch</u>, <u>supra</u> at 100.[12,13]

---

conduct."  See <u>United States</u> v. <u>Stevens</u>, 559 U.S. 460, 468-469 (2010), and cases cited.

[12] This narrow construction of § 43A, first announced in <u>Welch</u>, 444 Mass. at 100, reflects the court's determination that it represented the Legislature's intent in enacting the criminal harassment statute, and comports with the general intent of the First Amendment to the United States Constitution to bar the government from infringing on the freedom of speech, one of the fundamental personal rights and liberties guaranteed by the Constitution.  See, e.g., <u>United States</u> v. <u>Alvarez</u>, 132 S. Ct. 2537, 2543 (2012) ("[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content" [citation omitted]).  Although the government may, in certain circumstances, regulate speech based on its content, see, e.g., <u>Federal Communications Comm'n</u> v. <u>Pacifica Found.</u>, 438 U.S. 726, 744-745 (1978),  nonetheless, the Constitution "demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality" (citation omitted).  <u>Ashcroft</u> v. <u>American Civil Liberties Union</u>, 542 U.S. 656, 660 (2004). Accord <u>Ashcroft</u> v. <u>Free Speech Coalition</u>, 535 U.S. 234, 244 (2002) ("The government may violate [the mandate of the First Amendment] in many ways, . . . but a law imposing criminal penalties on protected speech is a stark example of speech suppression" [citations omitted]); <u>R.A.V.</u> v. <u>St. Paul</u>, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech, . . . or even expressive conduct, . . . because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid" [citations omitted]).  See generally <u>Hustler Magazine, Inc.</u> v. <u>Falwell</u>, 485 U.S. 46, 50-51 (1988) ("[T]he freedom to speak one's mind is not only an aspect of individual liberty -- and thus a good unto

The defendant argues that § 43A only punishes

constitutionally unprotected speech, and that his convictions

cannot stand because each of the letters forming the basis of

---

itself -- but also is essential to the common quest for truth
and the vitality of society as a whole" [quotation omitted]).

[13] The dissent suggests that the Welch case was "improvident
and should be revisited" to the extent our opinion may be
understood to interpret "§ 43A as applicable only to
constitutionally unprotected speech" in order to narrow it
sufficiently to be constitutional.  Post at note 10.  This view
misreads Welch, at least in part.  We concluded in Welch that in
drafting § 43A, the Legislature "intended the statute be applied
solely to constitutionally unprotected speech" (emphasis added).
Welch, 444 Mass. at 99.  In other words, we were seeking to
implement legislative intent, not simply to apply a judicially-
created, narrowing construction to the statute in order to
preserve its constitutionality.  In the O'Brien case, we
returned to, and repeated, the same characterization of the
Legislature's intent in enacting § 43A.  See O'Brien, 461 Mass.
at 420, 425.  The Johnson case also implicitly accepts the view
of the Welch and O'Brien cases that insofar as speech is
concerned, the Legislature intended the proscriptions of § 43A
to be limited to classes of constitutionally unprotected speech.
See Johnson, 470 Mass. at 308-312.  Since Welch was decided, the
Legislature has amended § 43A, see St. 2010, c. 92, § 10, but
not in a manner to suggest a change in the statute's purpose or
intent in relation to the types of speech it reaches.  We see no
reason, therefore, to abandon or reject in the present case our
previously articulated, and by now established, interpretation
of that intent, and our decision in this case is expressly
premised on it.  Moreover, this interpretation does meet the
legislative goal, emphasized by the dissent, see post at    , of
closing "a perceived loophole" in the criminal stalking statute,
G. L. c. 265, § 43, because the stalking statute requires proof
of an intent to place the alleged victim "in imminent fear of
death or bodily injury, see O'Brien, supra at 420 n.5 (citation
omitted; emphasis added), whereas § 43A, the criminal harassment
statute, has no such requirement of imminence.  See id.  For
this reason, the dissent's reliance on Commonwealth v. Walters,
472 Mass. 680 (2015), see  post at note 4, is not directly
apposite because the cited language from Walters was considering
the stalking statute, not the criminal harassment statute.

the charges qualified as constitutionally protected political speech under the First Amendment to the United States Constitution.  In substance, the defendant's argument challenges the sufficiency of the evidence:  if the evidence of "conduct or acts" of alleged criminal harassment consists solely of protected speech, the Commonwealth did not, and cannot, meet its burden of proving the defendant's guilt beyond a reasonable doubt.  We consider this argument in relation to each of the charges separately.

2.  <u>Sufficiency of the evidence</u>.  a.  <u>Complaint concerning Michael</u>.  A conviction under § 43A requires proof that "(1) the defendant engaged in a knowing pattern of conduct or speech, or series of acts, on at least three separate occasions; (2) the defendant intended to target the victim with the harassing conduct or speech, or series of acts, on each occasion; (3) the conduct or speech, or series of acts, were of such a nature that they seriously alarmed the victim; (4) the conduct or speech, or series of acts, were of such a nature that they would cause a reasonable person to suffer substantial emotional distress; and (5) the defendant committed the conduct or speech, or series of acts, willfully and maliciously."  <u>Johnson</u>, 470 Mass. at 307, quoting <u>Commonwealth</u> v. <u>McDonald</u>, 462 Mass. 236, 240 (2012).

The defendant's argument is that even if at least three of the five letters sent to Michael might qualify as separate acts

constituting "a knowing pattern of conduct or speech" (first element), these acts cannot be prosecuted as criminal harassment and subject to criminal punishment because the essence of the conduct was speech, and in particular, constitutionally protected political speech.  As to Michael, we agree.  That is, when those letters that were arguably "directed at" (see § 43A [a]) or targeted Michael[14] are considered, their central thrust is criticism of him as a selectman in the town; the personal insults and allegations concerning Michael's alleged criminal past and sexual improprieties appear to be intended to persuade him to resign from his elected position.  Because these letters were directed at an elected political official and primarily discuss issues of public concern -- Michael's qualifications for and performance as a selectman -- the letters fall within the

---

[14] The parties at trial treated all five letters as being "sent" to both Michael and Susan.  Under § 43A, however, the pertinent question is whether the letters were "directed at" Susan and Michael.  We do not think that all five letters were "directed at," or targeted, Michael, nor do we think all five letters were "directed at," or targeted, Susan.  It is true, as the dissent points out, post at    , that if a threat were directed at Susan but contained in a letter addressed to Michael and the letter were sent to him "with the reasonable expectation that he would communicate [the threat] to her," the threat would still qualify as a threat directed at Susan.  But the dissent is mistaken that we consider the same language in the same letter to qualify as constitutionally protected political speech in relation to Michael but unprotected speech in relation to Susan. See post at    .  Rather, our analysis of the criminal harassment complaint concerning Michael in large part considers different language or content in different letters from what we consider in relation to the criminal harassment complaint concerning Susan.

category of constitutionally protected political speech at the core of the First Amendment. See Commonwealth v. Lucas, 472 Mass. 387, 392 (2015), quoting New York Times v. Sullivan, 376 U.S. 254, 270 (1964) ("Our constitutional system 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all'"). Where matters of public concern are the focus -- that is, "any matter of political, social, or other concern to the community" (citation omitted), Snyder v. Phelps, 562 U.S. 443, 453 (2011) -- the First Amendment protections are often more rigorous than when matters of private significance are at issue. See id. at 452.

In considering the First Amendment's protective reach, "critical" to the examination is the context and content of the speech at issue. See Federal Communications Comm'n v. Pacifica Found., 438 U.S. 726, 744 (1978). It is true that the letters were sent to Michael at his home, a location where the homeowner's privacy is itself entitled to constitutional protection. Cf. Rowan v. United States Post Office Dep't, 397 U.S. 728, 736, 738 (1970). Cf. also Cohen v. California, 403 U.S. 15, 21 (1971) ("[T]his Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which

cannot be totally banned from the public dialogue").  But Michael was an elected town official, and as Michael himself testified, receiving mail from disgruntled constituents is usual for a politician.  A person "who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs . . . [and] runs the risk of closer public scrutiny than might otherwise be the case."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 344 (1974).  Here, given Michael's status as a selectman and the content of the letters, it cannot be said that Michael's "substantial privacy interests [were] invaded in an essentially intolerable manner."  Cohen, supra.  See State v. Drahota, 280 Neb. 627, 630-631, 637-638 (2010) (defendant's abusive, outrageous, electronic mail messages to former professor running for State elective office, insofar as they did not qualify as fighting words, were protected speech not subject to criminal punishment under disturbing peace statute despite professor's previous instruction not to send further messages).  See also United States v. Popa, 187 F.3d 672, 673, 677-678 (D.C. Cir. 1999) (defendant's seven anonymous telephone messages left on United States Attorney's office telephone, containing racial epithets directed at United States Attorney and complaints about abusive police officers, constituted protected speech directed at public official; statute punishing anonymous telephone calls made with

intent to annoy, abuse, threaten or harass held unconstitutional as applied to defendant, requiring reversal of conviction); State v. Fratzke, 446 N.W.2d 781, 784-785 (Iowa 1989) (First Amendment precluded defendant from being punished under criminal harassment statute for offensive, profane letter written to State trooper to protest speeding ticket where no "fighting words" were included). Contrast Hott v. State, 400 N.E.2d 206, 208 (Ind. Ct. App. 1980) (upholding defendant's conviction of making indecent telephone call based on vulgar calls made to police chief and prosecuting attorney at their respective homes late at night to complain about police sergeant).

Conceding that the letters contain protected political speech, the Commonwealth urges that, as in Johnson, the defendant's speech was integral to a larger course of harassing conduct directed at Michael that caused Michael serious and reasonable alarm. The argument fails. With respect to the issue of integrated speech and conduct, this case is very different from Johnson. The facts before the court in Johnson, 470 Mass. at 303-305, demonstrated that the defendants used their speech intentionally to initiate and carry out a plan of harassment of the victims through the conduct of (many) third parties. [15] See Welch, 444 Mass. at 99 n.15, quoting Giboney v.

---

[15] In the Johnson case, the defendants twice posted false advertisements on the Internet Web site "Craigslist" about items

Empire Storage & Ice Co., 336 U.S. 490, 502 (1949) ("it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed").  Here, however, the defendant's speech did not initiate or carry out any separate conduct that could be deemed harassing or illegal for an independent reason (i.e., a separate crime).  The only conduct of the defendant's at issue is his writing and mailing the anonymous letters; as previously indicated, there was no evidence that the defendant's letters caused any other person to undertake any type of action in relation to Michael.

There is a second, independent, reason for rejecting the Commonwealth's argument in support of Michael's conviction:  the evidence presented at trial was insufficient to persuade a rational fact finder that Michael was himself "seriously alarmed" by the receipt of the letters, one of the elements of

---

that the victims supposedly were giving away or selling, causing members of the public to arrive at the victims' home and to telephone repeatedly, looking for the items.  Johnson, 470 Mass. at 303-304.  The defendants also sent an anonymous and ominous electronic mail (e-mail) message containing all the victims' personal identifying information; filed a false report with the Department of Children and Families (DCF) alleging that one of the victims physically abused his son, an act that caused DCF staff to initiate an investigation; and sent to one of the victims an e-mail message and letter from a fictitious person that falsely accused the victim of having sexually abused that person in the past.  See id. at 304-305.

the crime that the Commonwealth was obligated to prove.  Michael testified that he felt it was "unfair" that his "character was really run through the mud[,]" but recognized his election as selectman opened him up to some criticism, and that the emotional distress he experienced by receipt of the letters was "mostly [his] wife[,] because of her -- the way it impacted her."  He stated that he "felt bad that [his] wife had to go through a situation like this" because he aspired to be a selectman; "[i]t affected [him] very much because . . . [he] was putting her through this."  He did not identify any specific emotional consequences or impacts he suffered directly as a consequence of his receipt of the letters.

Michael's experience of being upset or distressed by his wife's experience does not qualify as the "serious[] alarm[]" or "substantial emotional distress" required by § 43A because his distress was not caused by his own receipt of the letters but rather was derivative of his wife's distress at her receipt of them.  Nothing the defendant did or said appeared to have "seriously alarm[ed]" Michael directly.  See Commonwealth v. Braica, 68 Mass. App. Ct. 244, 247-248 (2007).  Cf. Commonwealth v. Kessler, 442 Mass. 770, 773-774 (2004) (prosecution for open and gross lewd and lascivious behavior; insufficient evidence of shock and alarm).

In sum, in light of the generous constitutional protections afforded to political speech by the First Amendment (as well as art. 16 of the Massachusetts Declaration of Rights), and the lack of evidence of serious alarm on Michael's part, we conclude that the evidence was not sufficient to support the defendant's conviction of criminal harassment of Michael.[16]

b. Complaint concerning Susan. We turn to the sufficiency of the evidence as to Susan.

Three of the defendant's five letters were specifically directed at or targeted Susan: the third, fourth, and fifth.[17] Susan was married to Michael, but she was not a selectman, did not hold any political office, and had not run for election. We

_____

[16] The defendant argues that that the Commonwealth failed to prove that the defendant targeted Michael on three separate occasions, which is a required element of the crime. See Welch, 444 Mass. at 89-90. Of the five letters mailed by the defendant, the first and second letters were the ones specifically "directed at" Michael, i.e., the ones that specifically targeted him. The handwritten note addressed to "Mikey and Susan" also arguably targeted Michael (as well as Susan). However, the record is unclear whether this note was attached to either the second or the third letter. If this note was in fact attached to and sent with the second rather than the third letter, we agree with the defendant that there may well not have been three separate incidents of alleged harassment, and that this could be a separate reason warranting reversal of his conviction. We need not decide the question, however, given the other two reasons why the conviction cannot stand.

[17] The third and fourth letters were sent to Susan, the salutations in them were to Susan, and the contents of those letters also make clear that they were directed at her. The fifth letter was addressed to her, but the salutation was to "Lorraine." However, the note on the letter and their contents certainly indicated that the intended target of the letter was Susan -- or so the jury could have found.

do not agree with the defendant's suggestion that being married to a public office holder makes one in effect his alter ego. The defendant's speech directed at Susan, fairly considered, was not an expression of political views about a public official but rather a series of offensive personal comments about her and her husband Michael. But the fact that the speech may not be categorically protected as political speech does not mean that it therefore automatically qualifies as constitutionally unprotected speech. Given this court's interpretation of § 43A and its underlying legislative intent, however, the speech must fit in a category of unprotected speech if the defendant's conviction of criminally harassing Susan based on the contents of his speech is to stand. See Federal Communications Comm'n v. Pacifica Found., 438 U.S. at 744 ("content and context of speech are critical elements of First Amendment analysis").

It is clear that the defendant's letters addressed to Susan do not contain "fighting words," the category of unprotected speech that Welch primarily discussed.[18] In addition, for the reasons we have previously stated, we disagree with the Commonwealth that this case is like Johnson, and that the

_____

[18] "Fighting words" are words "which by their very utterance inflict injury and or tend to incite an immediate breach of the peace and words plainly likely to cause a breach of the breach by the addressee" (quotations and citations omitted). Welch, 444 Mass. at 94. Accord, O'Brien, 461 Mass. at 423.

defendant's speech contained in the letters directed at Susan was sufficiently intertwined with conduct to be treated as unprotected. Contrast Johnson, 470 Mass. at 309-311. Nor is there any suggestion that the letters contain other possible categories of unprotected speech such as words that incite violence, obscenity, defamation,[19] or fraudulent speech. See, e.g., United States v. Stevens, 559 U.S. 460, 468-469 (2010), and cases cited. "True threats," however, are different. True threats represent a category of unprotected speech that our cases have noted is relevant to criminal harassment as defined and proscribed by § 43A. See Johnson, 470 Mass. at 311 n.12. See also O'Brien, 461 Mass. at 423-425 & n.7. We have stated that:

> "[a] true threat does not require an explicit statement of an intention to harm the victim as long as circumstances support the victim's fearful or apprehensive response. . . . Nor does a true threat threaten imminent harm; sexually explicit or aggressive language directed at and received by an identified victim may be threatening, notwithstanding the lack of evidence that the threat will be immediately followed by actual violence or the use of physical force. . . .
>
> ". . .
>
> "[T]he 'true threat' doctrine applies not only to direct threats of imminent physical harm, but to words or

___

[19] On the record presented, the speech would not qualify as defamatory because there was no evidence presented that the speech was false. See, e.g., Harrington v. Costello, 467 Mass. 720, 728 n.15 (2014), quoting White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004), and Restatement (Second) of Torts § 558 (1977).

actions that -- taking into account the context in which they arise -- cause the victim to fear such harm now or in the future and evince an intent on the part of the speaker or actor to cause such fear"(quotations and citations omitted).

O'Brien, supra at 424-425.[20]  See Commonwealth v. Chou, 433 Mass. 229, 236 (2001) (true threats include "words that are intended to place the target of the threat in fear, whether the threat is veiled or explicit").

We conclude that, viewed in context, a jury reasonably could conclude that the defendant's speech directed at Susan that was contained in each of the last three letters qualified as true threats.  That is, because -- in contrast to the speech directed at Michael -- we cannot conclude as a matter of law

---

[20] See, e.g., Virginia v. Black, 538 U.S. 343, 359-360 (2003) ("The speaker need not actually intend to carry out the threat.  Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur'" [citation omitted]); United States v. Fulmer, 108 F.3d 1486, 1491 (1st Cir. 1997) ("whether [the defendant] should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it is made"); Shackelford v. Shirley, 948 F.2d 935, 938 (5th Cir. 1991) ("[E]xpression has special value only in the context of 'dialogue' . . . . As speech strays further from the values of persuasion, dialogue and free exchange of ideas the [F]irst [A]mendment was designed to protect, and moves toward threats made with specific intent to perform illegal acts, the [S]tate has greater latitude to enact statutes that effectively neutralize verbal expression").  Cf. Watts v. United States, 394 U.S. 705, 708 (1969) (distinguishing between unprotected true threats and protected political speech).  See generally, Volokh, One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking", 107 Nw. U.L. Rev. 731, 740-744 (2013).

that the speech directed at Susan that was contained in these three letters qualified as <u>protected</u> speech, it becomes a question for the fact finder to determine whether the speech was unprotected speech. Cf. <u>United States</u> v. <u>Stock</u>, 728 F.3d 287, 298 (3d Cir. 2013) ("In the usual case, whether a communication constitutes a threat or a true threat is a matter to be decided by the trier of fact. . . . It is not unprecedented for a court to conclude that a communication does not legally qualify as a threat or true threat. . . . [A] court may properly dismiss an indictment as a matter of law if it concludes that no reasonable jury could find that the alleged communication constitutes a threat or a true threat" [quotations and citations omitted]).

These three letters contained vulgar and hateful insults and comments that in their choice of language and their repetitive nature were disturbing, reflecting what could be found to be an obsessive interest in private matters relating to Susan -- especially her marital relationship. But more to the point, some of the specific comments in the letters, such as Susan's possible future need to have plastic surgery to change her appearance as a self-protective measure, her current need to move out of their home, provocative warnings to Susan about attending town meetings, and the reference to Michael having burned the home of his first wife with her in it, by themselves

could be found to qualify as expressing a danger to Susan's personal safety, especially in her home.

Furthermore, the text of the letters must be viewed contextually. From Susan's perspective these letters were three out of a total of five letters written to her by a person who refused to identify himself or herself except as a "concerned citizen," and were sent at regular, two-to-three week intervals over two months -- ceasing, it can be inferred, only after the defendant's son effectively revealed his father's identity. The anonymity of the letters made evaluation of the sender's intent impossible, and therefore could be found to have greatly increased the letters' potential to instill in Susan a fear of future harm, including physical harm, being visited on her in her home.[21]

As part of the contextual analysis, an individual's right "to be let alone" in her home is relevant. Cf. Rowan v. United States Post Office Dep't, 397 U.S. at 736, 738 ("But the right of every person 'to be let alone' must be placed in the scales with the right to communicate. . . . We therefore categorically reject the argument that a [mail order] vendor has a right under the Constitution or otherwise to send unwanted material into the

_____

[21] It also is worth noting that because the letters were anonymous, Susan would have been unable to halt their arrival at her home, such as requesting a block at the post office or, perhaps, seeking a civil restraining order pursuant to G. L. c. 258E.

home of another . . . .  That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives otherwise"). Cf. also People v. Shack, 86 N.Y.2d 529, 536 (1995) ("The Rowan analysis may be extended to [New York's telephone harassment statute]").  Not being a public official, Susan's right of privacy in her home was substantial.  Cf. Frisby v. Schultz, 487 U.S. 474, 476, 484-485 (1988) (upholding content-neutral ban against residential picketing:  "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society . . . [and] individuals are not required to welcome unwanted speech into their own homes" [quotations and citations omitted]).

Susan testified (and the jury could credit) that the defendant's acts of sending the series of anonymous letters made Susan feel no longer physically safe in her own home to the point that she wanted to move away.  See United States v. Bellrichard, 994 F.2d 1318, 1321 (8th Cir. 1993) ("As a general proposition, correspondence of this sort delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering, which was the situation in Watts [v. United States, 394 U.S. 705 (1969)]").  The repetitive mailing of anonymous

letters to Susan's home -- indicating, obviously, that the sender knew where she lived -- could reasonably be found by a jury as supporting and indeed amplifying the message of threat to Susan's personal safety that the three letters contained. See Hrycenko v. Commonwealth, 459 Mass. 503, 504, 511 (2011) (letter sent to judge's home "made it clear . . . that [the defendant] knew where [the judge] lived" and showed intent to intimidate judge).  See also United States v. Mabie, 663 F.3d 322, 327, 331 (8th Cir. 2011), cert. denied, 133 S. Ct. 107 (2012) (letters sent to prosecutors' unlisted home addresses constituted true threats).  Cf. Commonwealth v. O'Neil, 67 Mass. App. Ct. 284, 285-286, 294 (2006) (affirming conviction of criminal harassment where defendant mailed five letters from jail to victim at her home and two more to her family; although letters contained no explicit threats, they "presumed a familiarity with the victim" who had never socially interacted with defendant, and had "obsessive tone," establishing over-all threatening effect; no issue concerning First Amendment raised in case).[22,23]

---

[22] We disagree with the dissent that our discussion of true threat has "stretch[ed] the meaning of 'true threat' far beyond common understanding, removing broad swaths of speech from constitutional protection and imposing potential criminal liability on statements that might, in another's eyes, seem merely rude and offensive." Post at    .  We apply here the definition of true threats set out in the O'Brien case, and that definition is built on and follows Supreme Court precedent.  See

Our determination that in relation to Susan, a fact finder reasonably might find that the defendant's letters qualify as true threats does not mean that the defendant is guilty of criminal harassment; it means only that the speech on which the complaint of criminal harassment is premised might be found to qualify as fitting within a constitutionally unprotected category of speech that may be subject to prosecution under

---

O'Brien, 461 Mass. at 423-425. (Our disagreement with the dissent in this case, at least in part, seems to be based on differing interpretations of the facts, not on the definition of what constitutes a true threat.) As for subjecting "broad swaths" of constitutionally protected speech to criminal sanction, it would seem that the dissent's proposed interpretation of § 43A, which explicitly permits criminalization of constitutionally protected speech, has the potential to place far more protected speech at risk of criminal sanction than does our interpretation of the statute.

[23] The dissent suggests that there is no distinction between a true threat and the common-law offense of threatening to commit a crime, set out in G. L. c. 275, § 2. See post at    . We disagree. A threat to commit a crime within the scope of G. L. c. 275, § 2 -- the subject of Commonwealth v. Sholley, 432 Mass. 721 (2000), cert. denied, 532 U.S. 980 (2001), on which the dissent relies -- may well qualify as a true threat, but the opposite is not always true: not every "true threat" satisfies the elements of this crime. "The elements of threatening a crime include an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." Id. at 724-725, quoting Commonwealth v. Robicheau, 421 Mass. 176, 183 (1995). With a true threat, the focus is not so much on the defendant's intent and ability to "inflict a crime" on the alleged target but rather on protecting the alleged target from fear of violence and "from the disruption that fear engenders" (citations omitted). Virginia v. Black, 538 U.S. at 359.

§ 43A as a form of criminal harassment.[24] That is, in a prosecution for criminal harassment under § 43A based solely on a defendant's speech, if it cannot be concluded that, as a matter of law, the speech at issue is constitutionally protected speech, the question whether the speech fits within a category of unprotected speech constitutes a question of fact for the fact finder to decide. In this particular case, the question whether the defendant's challenged speech at issue qualified as true threats and therefore as constitutionally unprotected falls under the first of the five elements of the crime, see McDonald, 462 Mass. at 240, because it represents an essential part of the definition of "speech" as we have interpreted the term in the Welch, O'Brien, and Johnson cases.

---

[24] In addition to his constitutional challenge, the defendant challenges the sufficiency of the evidence with respect to two elements of the crime of criminal harassment directed at Susan. The Commonwealth, he claims, failed to prove that (1) the defendant intended to target Susan on three separate occasions (second element); and (2) the defendant's speech would cause a reasonable person in Susan's position to suffer substantial emotional distress (fourth element). We disagree. The last three letters sent to the Costellos' home constituted three separate occasions on which the defendant could be found to have directly targeted Susan. Further, and contrary to the defendant's argument, the evidence was sufficient for a jury to find that a reasonable person in Susan's position would have suffered substantial emotional distress due to the receipt of the series of personal letters, given their content, and that they were anonymous and mailed at regular intervals to her home over a period of approximately two months.

At trial, the judge instructed the jury on the elements of criminal harassment in accordance with Instruction 6.640 of the Criminal Model Jury Instructions for Use in the District Court (rev. 2013).[25]  These instructions did not explain that the "conduct or series of acts," G. L. c. § 43A (a), that the Commonwealth claimed qualified as harassment consisted solely or at least principally of speech -- i.e., the contents of the letters.  Nor did the instructions address specifically the character -- protected or unprotected -- of the defendant's

---

[25] The judge instructed the jury in part as follows:

"In order to prove the Defendant guilty of this offense, the Commonwealth must prove five things beyond a reasonable doubt.

"First, that the Defendant engaged in a known pattern of conduct or speech or series of acts on at least three separate occasions;

"Second, that the Defendant intended to target [Count I] Michael Costello and Count II, Susan Costello with a harassing conduct or speech or series of acts on each occasion;

"Third, that the conduct or speech or series of acts were such in nature that they seriously alarmed, Count I, Michael Costello, Count II, Susan Costello;

"Fourth, that the conduct or speech or series of acts was of such nature that they would cause a reasonable person to suffer substantial emotional distress, and;

"Five, that the Defendant committed the conduct or speech or series of acts willfully and maliciously.

"To satisfy the first element of the offense, the Commonwealth must prove the pattern of conduct, which includes a minimum of three incidents of harassment. . . ."

speech on which the two counts of the complaint were based. Although the defendant did not object to the instructions at trial, the failure to instruct the jury that where the complaint is based on incidents of pure speech, they must find the defendant's challenged speech constituted a true threat -- and therefore was constitutionally unprotected speech -- created a substantial risk of a miscarriage of justice.  Cf., e.g., Commonwealth v. Claudio, 418 Mass. 103, 117-119 (1994), overruled on other grounds by Commonwealth v. Britt, 465 Mass. 87, 99-100 (2013) (failure of judge to define "felony" as portion of charge on felony-murder, although not objected to at trial, was of "sufficient magnitude" to require, along with other instructional errors, reversal of defendant's convictions of murder in first degree); Commonwealth v. Niziolek, 380 Mass. 513, 526-527, 529 (1980) (failure of judge to define one of elements of arson, along with other instructional errors, required reversal of arson conviction).  Cf. also United States v. Ream, 506 Fed. Appx. 842, 845 (10th Cir. 2013) ("Whether a statement constitutes a true threat under 18 U.S.C. § 115 [threatening Federal official] represents a jury question" [citation omitted]); State v. Moulton, 310 Conn. 337, 340, 362-363 (2013) (offense of second-degree harassment proscribes harassing speech as well as conduct, but "in order to ensure that a prosecution under that [statute] does not run afoul of

the [F]irst [A]mendment, the court must instruct the jury on the difference between protected and unprotected speech whenever the [S]tate relies on the content of a communication as substantive evidence of a violation of [the statute]"; reversal of defendant's conviction required on somewhat different grounds); State v. Schaler, 169 Wash. 2d 274, 278 (2010) (provision of State harassment statute must be read to proscribe only "true threats"; jury instructions following statutory language erroneous because failed adequately to limit jury's consideration to true threats; reversal of conviction required); State v. Perkins, 243 Wis. 2d 141, 145-146, 165-167 (2001) (jury instruction on nature of threat required for conviction of crime of threatening judge was inadequate because it may have "failed to shield the defendant from a conviction based on constitutionally protected speech"; conviction reversed). The defendant is entitled to a new trial on the count of the complaint alleging criminal harassment of Susan, a trial at the conclusion of which the jury are to be instructed on the unprotected character of speech that they must find the Commonwealth to have proved beyond a reasonable doubt, along with all the elements of the offense in order for the jury to find the defendant guilty of criminal harassment.[26]

---

[26] Where the Commonwealth asserts, for example, that the defendant's speech is unprotected because it constitutes a true

3. <u>Prosecutorial error</u>.[27] We briefly address one of the defendant's remaining claims insofar as it may arise again if there is a new trial. The defendant claims that in the prosecutor's comments about whether a reasonable person would experience "substantial emotional distress," see § 43A (<u>a</u>), the prosecutor erroneously asked the jurors to individually "evaluate <u>your</u> feelings" after reading the letters and use "common sense."

The prosecutor's statements asking the jury to use their common sense clearly was not improper. Cf. <u>Opinion of the Justices</u>, 360 Mass. 877, 880 (1971), quoting <u>Williams</u> v. <u>Florida</u>, 399 U.S. 78, 100 (1970) ("[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation . . . [which] results from that group's determination of guilt or innocence"). However, we agree that the suggestion to the jurors to evaluate their

_____

threat, the judge would have to explain to the jury that the Commonwealth was required to prove beyond a reasonable doubt that the defendant's words, considered in light of all the surrounding facts that provide context, constituted a direct threat of imminent physical harm to the alleged victim or caused the alleged victim to fear physical harm now or in the future, and must further prove that the defendant intended to cause such fear. See <u>O'Brien</u>, 461 Mass. at 424-425.

[27] Because Count 1 of the complaint relating to Michael must be dismissed, our consideration of these remaining arguments is only relevant to Count 2 of the complaint, relating to Susan.

feelings would have been better left unsaid.  Application of a reasonable person standard, as is called for in assessing the issue of "substantial emotional distress," calls for an objective assessment to be made, but the exhortation to the jurors to evaluate their individual feelings suggests instead that a subjective assessment would be appropriate, or at least poses a risk that the jurors might substitute their individual, subjective reactions to the letters for a collective and objective assessment.

Conclusion.  The defendant's conviction on Count 1 of the complaint, relating to Michael Costello, is reversed and the complaint is to be dismissed.  The defendant's conviction on Count 2 of the complaint, relating to Susan Costello, is vacated and the verdict set aside, and the case is remanded to the District Court for a new trial consistent with this opinion.

So ordered.

DUFFLY, J.   (dissenting, with whom Spina and Hines, JJ., join).   I agree with the court that the defendant's conviction of criminal harassment under G. L. c. 265, § 43A (§ 43A), as to Michael Costello, should be reversed because the evidence introduced at trial, in Michael's own words, did not establish that he was "seriously alarm[ed]" by receipt of the defendant's letter on at least three of the occasions that he received one.[1]

I write separately because I do not agree with the court's conclusion that the defendant's conviction as to Michael's wife, Susan Costello, based on speech in letters directed to her, is supported under the court's prior, long-standing definition of what constitutes a "true threat."   See Virginia v. Black, 538 U.S. 343, 359-360 (2003).   The court maintains that its decision to expand the reach of the types of speech that now will be labeled unprotected "true threats" "comports with the general intent of the First Amendment to the United States Constitution to bar the government from infringing on the freedom of speech, one of the fundamental personal rights and liberties."   Ante at note 12.   In reality, however, the court today removes large quantities of heretofore protected speech from any constitutional protection.   Rather than expanding the definition

---

[1] Because Michael Costello and Susan Costello share the same last name, I refer to them by their first names.

of what constitutes a true threat, as the court does today, I would instead consider whether the defendant's speech, even if protected, may still subject him to conviction under § 43A, because the statute serves "a compelling state interest" and is "narrowly drawn to achieve that end" (citation omitted). See Commonwealth v. Lucas, 472 Mass. 387, 398 (2015); id. at 393, quoting R.A.V. v. St. Paul, 505 U.S. 377, 383-384 (1992) ("The fact 'that these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content . . . . [does] not [mean] that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content"). See Ward v. Rock Against Racism, 491 U.S. 781, 803 (1989); Commonwealth v. A Juvenile, 368 Mass. 580, 584 (1975) (under First Amendment, review of crime which regulates speech requires strict scrutiny).

Until now, "true threats" have been defined as being limited to

> "those cases where the defendant expresses an intention to inflict a crime on another, has the ability to carry out that crime, causes the victim to fear harm, and does so in circumstances that make the victim's fear justifiable."

Commonwealth v. Sholley, 432 Mass. 721, 727 (2000), cert. denied, 532 U.S. 980 (2001).  Cf. O'Brien v. Borowski, 461 Mass. 415, 425 (2012) (discussing § 43A in case involving civil harassment statute, G. L. c. 258E, and stating that true threats do not require "direct threats of imminent physical harm," where, "taking into account the context in which they arise," words or actions would "cause the victim to fear such harm now or in the future and evince intent on the part of the speaker or actor so cause such fear").  We have recognized these limitations to be necessary so that "the offense of threatening to commit a crime only reaches cases of 'true threats' that would not qualify as protected speech."  Commonwealth v. Sholley, supra.  Whether direct or indirect, the common denominator has been a threat of physical harm to the person, "now or in the future."  O'Brien v. Borowski, supra.  See ante at note 20, quoting Virginia v. Black, 538 U.S. at 360 ("a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur'" [citations omitted]).  Under the court's analysis today, however, henceforth speech will be considered unprotected if the statements, "when viewed in

context," could be found to increase the "potential to instill [in an intended target] a fear of future harm," because the recipient is unable to determine the speaker's intent.[2]  See ante at    .

The court's expansion of what heretofore have been "well-defined and narrowly limited classes of" constitutionally unprotected speech, O'Brien v. Borowski, supra at 422 (citation omitted), results essentially in the creation of a broad and amorphous category of unprotected speech.  Where the conduct at issue is speech, it also effectively eviscerates a critical difference between the criminal harassment statute and the

---

[2] The court notes that a jury may consider "surrounding facts that provide context" in order to find that a defendants speech or conduct "constituted a direct threat."  See ante at note 26.  Compare Spence v. Washington, 418 U.S. 405, 409-410 (1974) (defendant's activity of hanging marked flag from his bedroom window, combined with factual context, "lead to the conclusion that he engaged in a form of protected expression").  While the court asks the jury to determine whether, given the unspecified "context" it must consider, the defendant's speech to Susan constituted a true threat, "[t]he inquiry into the protected status of speech is one of law, not fact."  Connick v. Myers, 461 U.S. 138, 148 n.7 (1983).  The limits of each unprotected category of speech "have been determined by the judicial evaluation of special facts that have been deemed to have constitutional significance."  Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 505 (1984).  A court will review "to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited."  Id.

stalking statute (criminalizing "[w]hoever [1] willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and [2] makes a threat with the intent to place the person in imminent fear of death or bodily injury").  See G. L. c. 265, § 43 (a); Commonwealth v. Walters, 472 Mass. 680, 691 (2015) ("Comparing the definition of 'true threat' to the threat component of the stalking statute, we conclude that any verbal or written communication that qualifies as a threat as defined in the statute is also a 'true threat,' and therefore is not entitled to protection under the First Amendment").

The court does not explain the nature of the threatened crime it sees reflected in the letters sent to the Costellos, or in those sections of the letters it deems directed particularly at Susan, and does not state whether the threat is a threat to cause physical harm to Michael or to Susan.[3]  Nor, despite its

_____

[3] The court describes the speech directed at Susan in the last two letters as containing "vulgar and hateful insults" in language that could "reflect[] . . . an obsessive interest in" private matters, "especially her marital relationship."  Ante at .  The court does not explain the nature of the threatened harm to Susan's "personal safety" that it sees reflected in those sections of the letters, and how a jury could find that the

efforts to distinguish specific portions of the letters as directed at one or the other, does it explain how statements in a letter addressed to a husband and wife, in their home, are protected political speech as to him, while, as to her, the statements constitute constitutionally unprotected speech that leaves the defendant subject to criminal liability not only under § 43A, but presumably under other criminal statutes such as G. L. c. 275, § 2, threatening to commit a crime.  See Commonwealth v. Sholley, supra.  Instead, in the court's view, because the letters were anonymous, Susan was unable to evaluate the nature of the author's intent, which the court posits is sufficient to instill a greatly increased fear of future harm. Ante at    .  Thus, Susan's imagination as to what the author might have been intending is now enough to "cause the victim to fear [physical] harm," O'Brien v. Borowski, supra at 425, a far cry from the well-established definition of a true threat

---

statements constitute "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  See Virginia v. Black, 538 U.S. 343, 359 (2003).  The court also appears to disregard the fact that, in the letter in which the statements about Susan's husband were made, the defendant asked in the same portion of the letter how Susan could continue to support "such a bum" remaining in his role as a selectman.  See discussion, infra.

discussed in Commonwealth v. Sholley, supra.[4]  This cannot be

what the framers intended in drafting the First Amendment.

_____

[4] Compare, for example, the court's statement in
Commonwealth v. Walters, 472 Mass. 680, 695-696 (2015),
regarding what may constitute a "true threat" within the meaning
of the First Amendment to the United States Constitution, in
reviewing a conviction under the stalking statute, G. L. c. 265,
§ 43 (a):

> "Turning to the quotation on the page, '[m]ake no
> mistake of my will to succeed in bringing you two idiots to
> justice,' in the circumstances of this case, it is
> reasonable to interpret the 'two idiots' as referring to
> the victim and [her boy friend].  But even if one reads the
> sentence in combination with the photograph of the
> defendant, any particular violent message that might be
> attributed to the defendant from the presence of these two
> elements on the same page is speculative.  Although the
> photograph depicts the defendant holding a gun, nothing
> else about that image suggests a clear intent to commit
> violence. Furthermore, like the photograph, the word
> 'justice' is amenable to a reasonable, nonviolent
> interpretation, namely, that the defendant intended to
> pursue whatever legal means might be available to right
> wrongs he perceived the victim and [her boy friend] had
> inflicted on him. . . .

> "Finally, the Commonwealth asserted during oral
> argument that, given the limited total number of items on
> the defendant's Facebook profile page, the combined
> presence of (1) the photograph of the defendant with a gun,
> (2) the quotation about justice, (3) the reference to
> Rihanna [a well-known singer and survivor of domestic
> violence], and (4) the reference to the 'Governors . . .
> Task Force on Police Corruption,' suggested that the page
> could have had little meaning except to project the
> appearance of a threat against the victim and [her boy
> friend].  We agree that the page as a whole could have come
> across as vaguely ominous or disturbing.  However, because
> no evidence was introduced at trial regarding the
> defendant's opinion of or even knowledge about Rihanna, or

The court's attempt to distinguish the speech in the letters it deems directed at Susan rather than at Michael (although the parties, here and at trial, treated all of the letters as having been sent to both Michael and Susan) does not provide the support it seeks in this distinction. If Susan were the intended victim, a threat to her, communicated in a letter to Michael, with the reasonable expectation that he would communicate it to her, is no less a true threat than one sent to Susan directly, and whether the statement constituted a true threat (as opposed to whether the defendant's conduct met the requirements of § 43A) is determined based on an objective, reasonable person standard. See, e.g., Commonwealth v. James, 73 Mass. App. Ct. 383, 385-387 (2008), and cases cited ("When a defendant utters a threat to a third party who would likely communicate it to the ultimate target, the defendant's act constitutes evidence of his intent to communicate the threat to

_____

about whether the defendant did or did not participate in a task force on police corruption, we question whether it is reasonable to ascribe to these items the meaning that the Commonwealth suggests, and to then infer that the defendant in fact created and intended to use the page to place the victim in imminent fear of bodily harm. Ultimately, based on the trial record, we conclude that the evidence of the defendant's intent concerning the creation of the Facebook profile was insufficient with respect both to whether the page constituted a threat within the scope of § 43 (a) (2) and to the reasonableness of the victim's fear."

the intended victim").  Similarly, a threat to Michael,
delivered in a letter addressed to Susan, would likewise be a
true threat.

The court sees a statement in the fourth letter, addressed
to Susan and accompanied by a newspaper article about the
Attorney General's investigation of Michael and his "abuses," as
potentially a true threat to her.[5]  See ante at     ,    .
Applying the court's analysis, however, it would appear equally
likely to be a potential threat to Michael, intended to be
communicated through Susan.  Similarly, the fifth letter,
addressed to "Lorraine," in an envelope addressed to "Susan 'The
Maid' Costello," also contained comments about Michael's
performance as a selectman that might be viewed as a threat
under the court's analysis, and that seemingly were intended to
be communicated to him.[6]  In addition, both the first and second
letters stated that the defendant intended their content to be

---

[5] The court's reference is to the statement that, "[t]he
authorities will continue to hound [Michael] until you and he
can't stand it anymore.  Maybe you will have to live like Whitey
Bulger frequenting plastic surgeons to have any hope of a
peaceful lifestyle.  The only difference is Whitey has unlimited
funds and you don't."  See ante at     .

[6] The letter stated, as the court notes, that Michael
"forged title to his wife's car[,] set fire to his wife's house
with her in it[,] [and] screwed the cleaning lady then married
her," but continues, "Lorraine -- how stupid can you be to
support such a bum -- this is a reflection on you too."

distributed publically.[7] See Commonwealth v. Walters, 472 Mass. 680, 693 (2015), and cases cited ("Where communication of the threat is indirect -- for example, through an intermediary -- the Commonwealth must prove beyond a reasonable doubt that the defendant intended the threat to reach the victim"). In any event, a "true threat" is no less a threat because it involves a political subject or is directed at a politician. See Virginia v. Black, 538 U.S. 343, 358-361 (2003); Watts v. United States, 394 U.S. 705, 707-708 (1969) (per curiam).

The result of the court's decision today -- under which the same language, in an anonymous letter directed at an individual in the privacy of his or her home, may be political speech that is accorded the highest constitutional protection, or unprotected speech, depending on whether the reader holds an elected office -- will be "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their [own] personal predilections" (citation omitted).[8] Commonwealth v.

---

[7] "This letter will be all over town by then as well as at the selectmen['s] meeting"; "This is such a good letter I think I will send it around and post it at Vino's."

[8] It is not clear, for example, whether, under the court's analysis, if Susan were an elected member of the town's school committee, the letter involving Michael's conduct as a selectman would, as to her, be transformed from an unprotected "true threat" to protected political speech.

<u>Williams</u>, 395 Mass. 302, 304 (1985).[9]  Based on this expansive view of a "true threat," no reasonable person would be able to ascertain the nature of the prohibited conduct to be avoided so as not to be subject to criminal liability.  Conduct that is so broad and vague that it is not readily discernable cannot constitutionally support a criminal conviction.

A conclusion that the speech at issue here is constitutionally protected, however, need not, in my view, preclude prosecution of the defendant under § 43A as to the conduct directed at Susan.  That a government regulation may reach protected speech does not alone render it unconstitutional.  See <u>Frisby</u> v. <u>Schultz</u>, 487 U.S. 474, 484-488 (1988), and cases cited.  See, e.g., <u>Burson</u> v. <u>Freeman</u>, 504 U.S. 191, 198, 209-210 (1992) (one hundred-foot restriction on political speech near polling sites necessary to serve

---

[9] The court states that it considers, in large part, different portions of the language in that letter, or different letters, with respect to its determination whether the content was directed to Michael or to Susan.  See <u>ante</u> at note 14.  This purported distinction cannot be sustained.  It is not clear how a recipient of a letter addressed to "Mr. and Mrs. Costello," as some of the letters were, or addressed in some form to Susan, containing content evidently intended to be shared with Michael, would know which portions of the letter were "directed" to him or her.  See <u>id</u>.  It is particularly unclear how a recipient would understand that a letter addressed to Susan actually was "directed" at Michael, see <u>ante</u> at    , or how one letter, addressed to a husband and wife, actually was only directed at the wife, as the court concludes.  See <u>ante</u> at note 14.

"compelling State interest" and "narrowly drawn to achieve that end" [citation omitted]); <u>Ward</u> v. <u>Rock Against Racism</u>, 491 U.S. 781, 803 (1989) (upholding regulation of constitutionally protected speech); <u>Lehman</u> v. <u>Shaker Heights</u>, 418 U.S. 298, 302-303 (1974), and cases cited ("Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question").

Although the court's decision in <u>Commonwealth</u> v. <u>Welch</u>, 444 Mass. 80, 98-100 (2005) (<u>Welch</u>), commented that it would "no[t] hesitat[e]" to interpret the language of § 43A as applicable only to constitutionally unprotected speech, more specifically only to true threats, because it considered such a narrowing necessary in order to deem § 43A as constitutional, that statement was made in circumstances quite distinct from those confronting the court here.[10] While the court states today that

---

[10] In <u>Commonwealth</u> v. <u>Welch</u>, 444 Mass. 80, 82-83 (2005) (<u>Welch</u>), the factual context before the court involved a question of pure speech, where the offense statements were made in public. This was the lens through which the court considered what the Legislature must have intended in order to render § 43A

it must interpret § 43A as applicable only to unprotected speech, such as a true threat, or the provision would run afoul of constitutional protections, I do not agree that constitutionally protected speech must, in all circumstances, categorically be excluded from prosecution under § 43A, given that the statute considers specific types of harassing speech in conjunction with a pattern of conduct or series of acts. The United States Supreme Court has noted that "the States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called "fighting words," Cohen v. California, 403 U.S. 15, 20 (1971), citing Chaplinsky v. New Hampshire, 315 U.S. 568 (1942), but government also retains the ability, "consonant with the Constitution, to shut off discourse solely to protect others from hearing it . . . upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner," even where the speech at issue otherwise would be entitled to constitutional protection. Cohen v. California, supra at 21. A conclusion that § 43A may never

_____

sufficiently narrow to pass constitutional muster. In O'Brien v. Borowski, 461 Mass. 415, 425 n.7 (2012), the court held that, in Welch, it "erred in concluding that the criminal harassment statute was limited in its reach to 'fighting words.'" To the extent that Welch interpreted § 43A as applicable only to constitutionally unprotected speech, in my view, that decision was improvident and should be revisited.

apply to protected speech is inconsistent with these well-established principles, and would eviscerate the legislative purpose underlying its enactment.

The Legislature enacted § 43A in order to provide "a remedy to [stalking] victims before 'nonthreatening' harassment escalates into life-threatening assault." Welch, supra at 100. The provision "was passed in response to a perceived loophole in the stalking statute," which "left without remedy those victims plagued by harassment that, although potentially dangerous, did not include an overt 'threat' and thus was not actionable under existing law." Id. at 87-88. "'[S]talkers who become lethal move from non-threatening behavior to direct threats . . .' and 'criminal harassment law establishes a continuum along which law enforcement may confront stalking behaviors.'" Id. at 100, quoting Kirkman, Every Breath You Take: Massachusetts Steps up its Efforts to Stop Stalkers, 85 Mass. L. Rev. 174, 181, 183 (2001). It would be reasonable to conclude that, with the enactment of the criminal harassment statute, the Commonwealth need not wait until it is too late to protect victims of potentially dangerous violent crimes, and that, under ordinary tenets of First Amendment jurisprudence, the Commonwealth has demonstrated a compelling interest in criminalizing conduct and

speech that does not include a true threat, but nonetheless is "potentially dangerous" as contemplated by § 43A. Welch, supra at 88. Cf. United States v. Salerno, 481 U.S. 739, 749 (1987).

A conviction under § 43A requires proof that "(1) the defendant engaged in a knowing pattern of conduct or speech, or series of acts, on at least three separate occasions; (2) the defendant intended to target the victim with the harassing conduct or speech, or series of acts, on each occasion; (3) the conduct or speech, or series of acts, were of such a nature that they seriously alarmed the victim; (4) the conduct or speech, or series of acts, were of such a nature that they would cause a reasonable person to suffer substantial emotional distress; and (5) the defendant committed the conduct or speech, or series of acts, 'willfully and maliciously.'" Commonwealth v. Johnson, 470 Mass. 300, 307 (2014), quoting Commonwealth v. McDonald, 462 Mass. 236, 240 (2012). The requirement of the criminal harassment statute that speech be "directed at" one victim, on at least three occasions, removes the majority of protected speech from the statute's reach, and ensures, in the plain language of the statute, that § 43A will not apply to any speaker who disseminates a political, religious, or other protected message to a general audience, albeit that the message

contains vulgar, offensive, or disturbing speech.  Cf. Frisby v. Schultz, 487 U.S. 474, 483 (1998).  Additionally, to support a conviction under § 43A, the fact finder must determine that each of the three acts to which liability attaches would be understood as "harassing" by a reasonable person, ensuring that a defendant is not "at the mercy of a hearer's sensitivities." Commonwealth v. Johnson, supra at 308.  Cf. Texas v. Johnson, 491 U.S. 397, 409 (1989) (distinguishing between expressions of dissatisfaction with political policies and direct personal insults); Van Liew v. Stansfield, 474 Mass. 31, 38-39 (2016) (addressing insults about local public official's performance as political speech).  Thus, rather than the expansion of the meaning of a "true threat" that the court undertakes, § 43A could be viewed as adequately ensuring that constitutionally protected speech is not penalized, while, at the same time, avoiding "negat[ing] the Legislature's clear attempt to protect victims of harassment before that behavior escalates into more dangerous conduct."[11]  See Commonwealth v. O'Neil, 67 Mass. App. Ct. 284, 293 (2006).

---

[11] "Typically, stalking behaviors involve obsessional attractions to victims and are not necessarily intended to harm or frighten them."  Commonwealth v. O'Neil, 67 Mass. App. Ct. 284, 293 (2006).

Given this, there is no need to pursue the path the court chooses today, by stretching the meaning of "true threat" far beyond common understanding, removing broad swaths of speech from constitutional protection and imposing potential criminal liability on statements that might, in another's eyes, seem merely rude and offensive.